**SMART CALL, L.L.C. d/b/a Beyond Wireless, Appellant,**

v.

**GENIO MOBILE, Appellee.**

**No. 14–10–01017–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 25, 2011.

Gerald Fowler, Houston, for appellant.

Wilka E. Toppins, Keith M. Remels, J.W. Beverly, Houston, for appellee.

Panel consists of Justices ANDERSON, BROWN, and CHRISTOPHER.

## OPINION

JEFFREY V. BROWN, Justice.

This is an interlocutory appeal from the trial court's order denying the special appearance of Smart Call, L.L.C. Smart Call contends the trial court erred because it does not have the minimum contacts to support personal jurisdiction. We affirm.

I

Smart Call is a Delaware limited-liability corporation with Ohio as its principal place of business. Genio is a Texas corporation with its principal place of business in Sugar Land. Both companies are involved at different levels in the delivery of cell-phone service. Smart Call is a "mobile network operator" that purchases access to a national cell-phone network and then resells that access to companies that directly provide cell-phone service. Genio is a "mobile virtual network operator" that directly provides cell-phone service to its customers but does not maintain a physical cell-phone network and therefore must purchase access through a mobile-network operator.

Genio sought to introduce prepaid cellphone service in the Houston and Dallas markets. In 2008, Genio's president, Ricardo Flores, contacted Smart Call in Ohio on the recommendation of a friend, Humberto Galvan. To launch its cell-phone service, Genio needed (1) access to a national cell-phone network, and (2) SIM cards for its phones programmed with phone numbers linked to the network. Smart Call represented it could provide both. Negotiations ensued between the two companies over phone, e-mail, and video conferences, and Flores personally traveled twice to Ohio to meet with Smart Call.

In December 2008, a document entitled "GSM MVNO Service Agreement" was circulated via email among Flores, Galvan,

and Richard Stupansky, Smart Call's chief operating officer. Never signed, the service agreement contained terms referring to Smart Call and an unnamed mobile-virtual-network operator; it does not name Genio expressly.[1] The accompanying emails reflect a portion of what appears to be a protracted exchange concerning the terms of the agreement. The last e-mail in the record is from Galvan to Stupansky, in which Galvan apparently forwards the service agreement to Stupansky and suggests postponing a previously scheduled conference so Stupansky would "have time to review the mails below."[2] Galvan writes that Stupansky should "not worry about their requests, again most of them will not apply or change what we have already negotiated." There is no further indication that the parties adopted the service agreement, and Flores denied in deposition that Genio's breach-of-contract suit was based on the unsigned service agreement.

The record also contains a series of three Smart Call invoices sent to Genio at its Sugar Land office. Together, the invoices reflect the sale of 10,000 SIM cards with related programming and startup costs, totaling $112,000.[3] The invoices reflect they are to be billed and the products shipped to Genio's Sugar Land office. Genio alleges it wired $84,450 from its Texas bank to Smart Call in partial payment of the invoices, after which Genio alleges "significant performance delays" on Smart Call's part. Genio's CEO and vice president, Octavio Hinojosa, who joined the company in February 2009, testified that between February and June 2009, Genio and Smart Call representatives were in "constant communication," exchanging between 100 and 120 emails, four to five phone calls a week, and video conferencing "very constantly." Hinojosa also traveled to Ohio to meet personally with Smart Call.

Hinojosa testified that although Genio was otherwise ready to begin offering its pre-paid cell-phone service in February or March of 2009, it was unable to do so because it was waiting on Smart Call to provide the invoiced programmed SIM cards. Hinojosa testified that a SIM card must be linked to a ZIP code, which in turn generates an area code for a phone number, and that Genio requested Smart Call program its SIM cards with Texas area codes. Hinojosa further testified Smart Call knew Genio would service Texas markets exclusively, and estimated between ten and twenty separate communications between Genio and Smart Call regarding customization of the SIM cards for Texas cell-phone users.

In June 2009, Smart Call's CEO, Yehi Ben Soshan, traveled to Houston to meet with Flores and Hinojosa. The three discussed the delays on the project and, according to Flores and Hinojosa, Soshan

1. The service agreement appears to be a generic template containing blank fields to be filled in with the mobile-virtual-network operator's pertinent information.

2. Although Flores described Galvan as only "a friend" who referred Genio to Smart Call, this e-mail suggests Galvan played a continuing role in negotiations between the two companies.

3. The first invoice, dated December 8, 2008, includes charges for "Sim Cards," "New Account setup," and a "Sim Profile Setup Fee," totaling $87,500. It also reflects "payments/credits" of $68,750, leaving a balance of $18,750. The second invoice, dated February 4, 2009, includes charges for 5,000 "Sim Cards" at a cost of $17,500. It reflects "payments/credits" of $8,700, and so leaves a balance of $8,800. The final invoice, dated March 19, 2009, includes a charge for a "One Time Fee for Cell Control Sim Application" at a cost of $7,000, with no "payments/credits" and a balance due of $7,000.

ultimately told Flores and Hinojosa that Smart Call would not be able to provide the agreed-upon services. Smart Call directed Genio to another mobile-network provider and supplied Genio with 2,000 SIM cards, programmed with Texas area codes, which Hinojosa testified was a show of "good will." Genio then sued Smart Call for breach of contract, quantum meruit, promissory estoppel, and assumpsit. Genio asserts actual damages of $77,450, which reflects the $84,450 payment Genio made to Small Call less the $7,000 value of the SIM cards Smart Call provided after Soshan's June 2009 visit to Texas.

## II

### A

Whether a trial court has personal jurisdiction over a defendant is a question of law we review de novo. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). When, as here, the trial court issues no findings of fact and conclusions of law, all facts necessary to support the judgment and supported by the evidence are implied. *BMC Software,* 83 S.W.3d at 795.

The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software,* 83 S.W.3d at 793; *Brocail v. Anderson,* 132 S.W.3d 552, 556 (Tex. App.-Houston [14th Dist.] 2004, pet. denied). A defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases alleged. *BMC Software,* 83 S.W.3d at 793; *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex.1995).

Texas courts may exercise jurisdiction over a nonresident if the Texas long-arm statute authorizes the exercise of personal jurisdiction and the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *Moki Mac,* 221 S.W.3d at 574; *BMC Software,* 83 S.W.3d at 795. The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state. Tex. Civ. Prac. & Rem.Code § 17.042. The Texas Supreme Court has interpreted the broad language of the Texas long-arm statute to extend Texas courts' personal jurisdiction " 'as far as the federal constitutional requirements of due process will permit.' " *BMC Software,* 83 S.W.3d at 795 (quoting *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977)).

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *BMC Software,* 83 S.W.3d at 795. Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Int'l Shoe,* 326 U.S. at 319, 66 S.Ct. 154; *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). In determining whether a defendant has purposefully availed itself of the forum, courts should remember that only the defendant's contacts with the forum matter, the acts relied on must be purposeful rather than merely fortuitous, and the defendant must seek some benefit, advantage, or profit by availing itself of the forum. *Michiana,* 168 S.W.3d at 785.

Texas courts may exercise two types of jurisdiction based on a nonresident's contacts with the state. If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Moki Mac,* 221 S.W.3d at 575; *BMC Software,* 83 S.W.3d at 796. In contrast, when specific jurisdiction is alleged, we focus the minimum-contacts analysis on the relationship among the defendant, the forum, and the litigation. *Moki Mac,* 221 S.W.3d at 575–76. Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id.* at 576. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Id.* at 580, 585. To identify the operative facts of the litigation, we select those facts that would be the focus of the trial. *See id.; Pulmosan Safety Equip. Corp. v. Lamb,* 273 S.W.3d 829, 839 (Tex.App.-Houston [14th Dist.] 2008, pet. denied).

### B

Genio contends that Smart Call engaged in acts amounting to "doing business" in Texas by contracting with a Texas resident and engaging in other purposeful contacts. *See* Tex. Civ. Prac. & Rem.Code § 17.042. Genio also maintains Smart Call has constitutionally sufficient minimum contacts to support specific jurisdiction, and that the assumption of jurisdiction would not offend traditional notions of fair play and substantial justice. Specifically, Genio contends the following minimum contacts support personal jurisdiction over Smart Call: (1) the three invoices sent to Genio's Sugar Land office, each of which Genio contends was a separate contract Smart Call breached; (2) Soshan's June 2009 meeting with Flores and Hinojosa in Texas, at which he informed them that Smart Call would not be able to perform as agreed; (3) Smart Call's knowledge that the SIM cards provided under the agreement would be used by Texas customers and therefore must be programmed with Texas area codes; (4) 2,000 SIM cards programmed with Texas area codes were actually delivered to Genio; (5) Smart Call's promise to provide access to a national cell-phone network, which would necessitate use of Texas cell-phone towers; (6) acceptance of partial payment of the invoices through wire transfer from Genio's Texas bank; and (7) extensive communication between the parties, including phone, e-mail, and video conferencing.

Smart Call, on the other hand, maintains it lacks sufficient minimum contacts with Texas because (1) Genio contacted Smart Call in Ohio; (2) Smart Call had not done any business in Texas before contracting with Genio; (3) the contract between Genio and Smart Call was to be performed in Ohio and Montana; and (4) Smart Call has no physical presence or employees in Texas and has never marketed its products and services in Texas. Smart Call argues that merely contracting with a Texas company does not constitute purposeful availment for jurisdictional purposes. *See, e.g., IRA Res., Inc. v. Griego,* 221 S.W.3d 592, 597–98 (Tex.2007) (per curiam); *Alenia Spazio, S.p.A. v. Reid,* 130 S.W.3d 201, 213 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *Shell Compania Argentina de Petroleo, S.A. v. Reef Exploration, Inc.* 84 S.W.3d 830, 838 (Tex.App.-Houston [1st Dist.] 2002, pet. denied).

The parties agree they contracted between themselves but do not agree which documents evince their agreement. Smart Call argues the unsigned service agree-

ment, which requires any disputes to be submitted to arbitration in Ohio under Ohio law, is the contract. Conceding the document is unsigned and does not name Genio as a party, Smart Call argues the accompanying e-mails constitute written confirmation of its terms sufficient to make the contract enforceable.[4] *See* Tex. Bus. & Com.Code § 2.201(b) (providing an unsigned contract for goods may be enforceable upon written confirmation of the contract's terms). Smart Call further argues the forum-selection clause is evidence of Smart Call's intent to avoid availing itself of the benefits and protections of Texas law. *See Michiana,* 168 S.W.3d at 792 (citing *Burger King,* 471 U.S. at 482, 105 S.Ct. 2174) (holding choice-of-law provisions should be considered when determining purposeful availment). Further, because all of its negotiations with Genio and the three invoices are subsumed by the service agreement, Smart Call argues its dealings with a Texas resident are confined to an isolated contract calling for performance in Ohio and Montana and which a Texas resident initiated.[5]

Genio concedes the service agreement is "useful to indicate [the parties'] intended course of dealing," but maintains none of the e-mails constitute written confirmation of the contract under section 2.201(b) of the Business and Commerce Code. Genio instead bases its breach-of-contract claim on the three invoices, each of which, Genio argues, is an individual contract. Accordingly, Genio characterizes its claim as a breach of several contracts rather than of one, isolated contract.

We will not delve in to the merits of the underlying case by determining whether the unsigned service agreement controls the dispute in this case. Our inquiry is limited to the evidence of jurisdictional facts sufficient to support the trial court's special-appearance ruling. *See Michiana,* 168 S.W.3d at 790–91; *Info. Svcs. Grp., Inc. v. Rawlinson,* 302 S.W.3d 392, 407 (Tex.App.-Houston [14th Dist.] 2009, pet. denied); *Pulmosan Safety Equip.,* 273 S.W.3d at 839. Whether the service agreement is binding on the parties and requires dismissal of this claim in light of its forum-selection clause is a determination best left to the trial court after we have determined the personal-jurisdiction issue.

1

 For the reasons discussed below, we conclude Smart Call has sufficient minimum contacts to support specific jurisdiction over it in this case.[6] The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of the unilateral activity of another party or third person. *Michiana,* 168 S.W.3d at 785. Accordingly, it is well-settled by the supreme courts both of the United States and Texas that there can be no purposeful availment in cases involving isolated sales solicited by consumers who proposed to use the product in a state where the defendant does

---

4. Smart Call does not identify which e-mail or what language it believes amounts to written confirmation of the contract.

5. In its brief, Smart Call argues performance is to take place partially in Montana because that is "where its cell tower is located." We cannot find Montana mentioned anywhere else in the record, including the unsigned service agreement, and it is not clear to us what connection a cell tower in Montana would have to cell-phone service in Texas.

6. Genio maintains these contacts are also sufficient to find Smart Call amenable to general jurisdiction. Because we conclude Smart Call is amenable to specific jurisdiction, we do not analyze whether it is also amenable to general jurisdiction.

not conduct business. *Burger King*, 471 U.S. at 475 n. 17, 105 S.Ct. 2174; *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Michiana*, 168 S.W.3d at 786. Smart Call attempts to place this case within this framework by characterizing it as "a single Texas agreement, with a single Texas resident," initiated by Genio and to be performed in Ohio and Montana.

But even if we agree the relationship between the parties in this case is governed by a single contract, it does not necessarily follow that a single contract cannot contain contacts sufficient to establish purposeful availment of a foreign jurisdiction. *See Michiana*, 168 S.W.3d at 787. Our supreme court has acknowledged that a single contract could not automatically confer jurisdiction "when it involves a single *contact* taking place outside the forum state," but further recognized that "[i]t is true that in some circumstances a single *contract* may meet the purposeful-availment standard." *Id.* The court further noted the United States Supreme Court's holdings that a long-term franchise agreement "may establish minimum contacts because, though it stems from a single contract, it involves many contacts over a long period of time," and that a life-insurance policy "may stem from a single contract, but necessarily involves a series of contacts until death does the parties part." *Id.* (citing *Burger King*, 471 U.S. at 480, 105 S.Ct. 2174; *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

In *Michiana*, the supreme court concluded that a single product sale stemming from a single phone call initiated by a Texas resident to a nonresident defendant was not a purposeful contact sufficient to satisfy the due-process minimum-contacts test. *Id.* at 781, 78586. In another case, the court similarly concluded Texas courts

had no jurisdiction over a French manufacturer that made no effort to market its winepress equipment in Texas, had only one other Texas sale, and did not initiate the sale at issue to a Texas buyer. *CMMC v. Salinas*, 929 S.W.2d 435, 439 (Tex.1996). This case is similar to *Michiana* and *CMMC* in that in each case the Texas resident initiated the sale. But this case differs in a critical respect—it is not an isolated sale of goods, but a long-term service agreement.

Smart Call indeed sold goods to Genio—10,000 SIM cards. But that was just part of the transaction. In the language of the unsigned service agreement, Genio was to "operate as a reseller of [Smart Call's] Services and Products." The SIM cards were merely a means to effectuate the larger purpose of the agreement: to provide Genio and its Texas customers with ongoing access to a national cell-phone network. Under this arrangement, Smart Call agreed with a Texas company to specially program SIM cards with Texas area codes for use by Texas residents. Every time a Genio customer placed or received a call, Smart Call would provide the airtime. Necessarily, therefore, Smart Call's contacts with Texas would be continuous, as it would daily provide cell-phone-network access to Texans throughout the life of its agreement with Genio.

The transaction Smart Call and Genio contemplated in this case is very different from the random and fortuitous encounters that led the Indiana dealership in *Michiana* to sell a recreational vehicle or the French manufacturer in *CMMC* to sell a winepress. Here, the parties contemplated a long-term agreement, the goal of which was to provide cell-phone service on an ongoing basis exclusively to Texans.

These facts bear more similarity to the United States Supreme Court's *Burger King* than our supreme court's line of sin-

gle-sale cases. Burger King sued Rudzewicz, a franchisee, in Florida, the location of its headquarters, even though Rudzewicz's franchise was in Michigan. *Burger King*, 471 U.S. at 466, 105 S.Ct. 2174. Rudzewicz argued that he was not subject to personal jurisdiction in Florida because his restaurant was located in Michigan and he had never even visited Florida. *Id.* at 469, 479, 105 S.Ct. 2174. The court concluded that "this franchise dispute grew directly out of " 'a contract which had a substantial connection with that State.' " *Id.* at 479, 105 S.Ct. 2174 (quoting *McGee*, 355 U.S. at 223, 78 S.Ct. 199). In reaching its conclusion, the court noted that Rudzewicz deliberately " 'reached out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479–80, 105 S.Ct. 2174. The Court also explained that in light of Rudzewicz's "voluntary acceptance of the long-term and exacting regulation of his business" from Burger King's Miami headquarters, the quality and nature of his relationship to the company in Florida could in no sense be viewed as random, fortuitous, and attenuated. *Id.* at 480, 105 S.Ct. 2174. Further, Rudzewicz's default on the required payments to the Florida home office and his illegal use of Burger King's trademarks "caused foreseeable injuries to the corporation in Florida" and therefore "it was, at the very least, presumptively reasonable for Rudzewicz to be called to account there for such injuries." *Id.*

Smart Call argues this case is unlike *Burger King* because the agreement here "does not create the kind of interdependent relationship represented by a franchise agreement." Granted, there is no franchise agreement under these facts. Questions of personal jurisdiction are al-

ways highly fact-intensive, and it is rare that two cases are completely analogous. The contracts in this case and in *Burger King* are different documents addressing different products and services in different industries. But the rationale behind *Burger King* is not limited to disputes surrounding franchise agreements. Rather, *Burger King* stands for the principle that a single contract can produce "continuing and wide-reaching contacts" that cross the purposeful-availment threshold even though a single, isolated contract for a sale of goods in a foreign jurisdiction remains too random, fortuitous, or attenuated to confer jurisdiction. *See Burger King*, 471 U.S. at 480, 105 S.Ct. 2174; *cf. Michiana*, 168 S.W.3d at 786–88.

The *Burger King* court, acknowledging that a contract with an out-of-state party does not automatically establish sufficient minimum contacts, also emphasized the need for a " 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' " *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316–17, 63 S.Ct. 602, 87 L.Ed. 777 (1943)). It is these factors— prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum. *Id.* The business designation of the parties' relationship to each other therefore is but one consideration in a determination of whether the parties have the kind of "interdependent relationship" that constitutes a purposeful availment of the forum by the out-of-state defendant.

Smart Call negotiated with Genio fully knowing that Genio served only Texas customers and took the additional step of customizing its products for the Texas market—a fact inconsistent with an argument that Smart Call's Texas contacts were random or fortuitous. As a result, this dispute grew directly out of "a contract which had a substantial connection" with the forum state, in this case Texas. *Burger King.* 471 U.S. at 479, 105 S.Ct. 2174 (quoting *McGee*, 355 U.S. at 223, 78 S.Ct. 199). The service agreement's contemplated terms, and in particular the obligations placed on Genio, sets the stage for a long-term agreement through which Smart Call, a mobile-network operator, would reap "manifold benefits" from Genio, a mobile-virtual-network operator that could sell Smart Call's airtime to its Texas customer base. *See id.* at 479–80, 105 S.Ct. 2174. Just as the court concluded it would be foreseeable that a breach of the Burger King franchise agreement would cause injuries to Burger King in Florida, we conclude that a breach of this agreement would cause foreseeable injuries to Genio in Texas. Genio's entire customer base was to exist in Texas; Smart Call's failure to deliver network access specifically to Texas cell-phone users would immediately result in Genio's inability to provide its customers with its service.[7] *See id.*

Additionally, Smart Call's CEO Yehi Ben Soshan's 2009 visit to Texas to meet with Flores and Hinojosa indicates further purposeful availment of Texas. It was at this meeting that Smart Call allegedly breached its contract with Genio when Soshan acknowledged Smart Call could not provide the allegedly agreed-upon goods and services and referred Genio to another mobile-network provider.

We recently held that an art dealer crossed a purposeful-availment "bright line" when he voluntarily traveled to Texas to conduct business with a Texas resident and allegedly committed a tort in Texas by making misrepresentations at the meeting. *Max Protetch, Inc. v. Herrin,* 340 S.W.3d 878, 887 (Tex.App.-Houston [14th Dist.] 2011, no pet.). In *Protetch,* a Texas resident contracted to purchase a table from a New York-based art dealer. *Id.* at 882. All negotiations leading to the contract occurred in New York, and the sale of the table occurred there. *Id.* The Texas resident assumed responsibility for shipping the table from New York to Texas. *Id.* After the table arrived damaged, the dealer visited the customer's Houston home while in town on other business. *Id.* The dealer allegedly acknowledged the table was damaged and told the buyer it would be repaired. *Id.* But after the table was shipped back to New York, the buyer was told it could not be repaired and his money was never returned. *Id.*

We concluded that the meeting in *Protetch* was a purposeful contact. During the meeting, misrepresentations were allegedly made that formed "a substantial portion of the core of the litigation." *Id.* at 887. Although the dealer's Texas contacts were limited to contracting with a Texas resident, phone calls discussing the sale of the table, and the one Texas meeting, we concluded that "the face-to-face meeting in Houston tips the scales." *Id.* Our holding was not simply based on the allegation that the New York dealer com-

---

7. Smart Call makes the unsupported assertion that the unsigned service agreement calls for the contract to be performed in Ohio or Montana. We cannot agree. The contract itself is silence as to where it will be performed. And considering the agreement between the parties called for Smart Call to deliver SIM cards to Genio in Texas and provide network access to Texas cell-phone users, the evidence demonstrates the contract would have been at least partially performed in Texas.

mitted a tort in Texas. Rather, we concluded he "voluntarily came to Texas, and while he was here he purposefully conducted business with a Texas resident" such that he "crossed a bright line and purposefully availed [him]self of the privilege of conducting business in Texas." *Id.*

Our holding in *Horizon Shipbuilding Inc. v. BLyn II Holding, LLC,* 324 S.W.3d 840 (Tex.App.-Houston [14th Dist.] 2010, no pet.), is also instructive. In *Horizon,* an Alabama corporation agreed to refurbish a yacht owned by a Texas corporation. *Id.* at 844. After a contract was executed in, and the yacht was shipped to, Alabama, representatives of the Alabama corporation attended two Texas meetings to discuss financing and other details surrounding the yacht's refurbishment. *Id.* at 845. We concluded the trial court could have properly determined that the voluntary meetings were substantial and purposeful because there remained for discussion critical aspects of the refurbishment plans; also, the meetings constituted a significant part of an ongoing relationship between the parties. *Id.* at 848–49.

Similarly, it is undisputed that Soshan traveled to Texas for the sole purpose of meeting with Genio regarding the parties' business arrangement. His voluntary decision to travel to Texas to conduct business can only be classified as a purposeful act, and not random, fortuitous, or attenuated. *Moki Mac,* 221 S.W.3d at 575. Furthermore, the trial court could have found Smart Call sought a benefit, advantage, or profit in Texas in two ways. First, the trial court could have found that Smart Call met with Genio in Texas to discuss performance delays and seek a resolution that would actualize the parties' agreement. Or the trial court could have concluded that Smart Call simply sought the benefit of informing Genio it could not perform its obligations under the contract while failing to refund the money Genio had already paid to Smart Call. *See Protetch,* 340 S.W.3d at 887.

The trial court also could have concluded the Texas meeting bears a substantial connection to the operative facts of this litigation. Genio's action against Smart Call is a simple breach-of-contract claim, and it alleges Smart Call breached the contract at the Texas meeting.[8] *See Glencoe Capital Partners II, L.P. v. Gernsbacher,* 269 S.W.3d 157, 167 (Tex.App.-Fort Worth 2008, no pet.) ("Unlike the misrepresentations in *Moki Mac,* which were tangential to the plaintiffs' core negligence claim, Appellants' misrepresentations in this case are the core of Appellees' claims.").

For all the reasons above, we conclude Smart Call's contacts with Texas were purposeful and sufficient to warrant requiring Smart Call to defend this suit in Texas.

## C

▪ Although we have concluded Smart Call had sufficient minimum contacts with Texas constituting purposeful availment of this forum, we still must consider whether exercising jurisdiction over Smart Call would offend traditional notions of fair play and substantial justice. *See Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154; *BMC Software,* 83 S.W.3d at 795. In that analysis, we consider (1) the burden on Smart Call; (2) the interest of Texas in adjudicating the dispute; (3) Genio's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the

---

8. Although Hinojosa complained of "significant performance delays" prior to the Texas meeting, Genio does not contend Smart Call breached its contract with Genio until Soshan came to Texas.

shared interest of the several states in furthering fundamental and substantive social policies. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 232 (Tex.1991).

Smart Call does not identify in its brief these factors or directly connect any arguments to them. Instead, Smart Call argues only that it should not have to defend this suit in Texas because "Genio agreed that its deal with Smart Call was subject to Ohio law" and that any dispute arising from the agreement was to be settled by mediation or binding arbitration in Ohio. The existence of the forum-selection clause in the unsigned service agreement is to be considered in a purposeful-availment analysis, but it is not dispositive. *See Michiana,* 168 S.W.3d at 792 (citing *Burger King,* 471 U.S. at 482, 105 S.Ct. 2174). Aside from urging application of the forum-selection clause, Smart Call makes no argument as to why it is unduly burdensome for it to defend this case in Texas, nor does it address any other factor in the analysis. Without more, we have no basis for concluding it would violate traditional notions of fair play and substantial justice to confer jurisdiction over Smart Call.

\* \* \*

For the foregoing reasons, we overrule Smart Call's sole issue. We therefore affirm the trial court's order denying Smart Call's special appearance.