**Affirmed and Memorandum Opinion filed August 14, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00223-CV

---

## SMART CALL, LLC, Appellant

### V.

## GENIO MOBILE, INC., Appellee

---

**On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 2010-25504**

---

## M E M O R A N D U M   O P I N I O N

Appellant Smart Call, LLC appeals the trial court's denial of its motion to compel arbitration of appellee Genio Mobile, Inc.'s claims and subsequent entry of default judgment against Smart Call. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This case, which stems from a business transaction in which Smart Call was to provide telecommunications products and services to Genio, is before us for a

second time. In the first appeal, this Court affirmed the trial court's denial of Smart Call's special appearance. *See Smart Call, L.L.C. v. Genio Mobile*, 349 S.W.3d 755 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

As explained in our earlier opinion, Smart Call is an Ohio-based "mobile network operator" (MNO) that purchases access to a national cell-phone network and then resells that access to companies that directly provide cell-phone service. *Id.* at 757. Genio is a "mobile virtual network operator" (MVNO) in Sugar Land that directly provides cell-phone service to its customers but does not maintain a physical cell-phone network and therefore must purchase access through an MNO. *Id.* Seeking to introduce prepaid cell-phone service in Houston and Dallas, Genio contacted Smart Call in 2008 for the purpose of obtaining access to a national cell-phone network and SIM cards for its phones programmed with phone numbers linked to the network. *Id.*

In December 2008, a document titled "GMS MVNO Service Agreement" was circulated via email among Humberto Galvan, negotiating on behalf of Genio Mobile, Richard Stupansky, Jr., Smart Call's chief operating officer, and Yehiel Ben Shoshan, Smart Call's chief executive officer. The MNVO agreement included blank fields for the name of the "Customer" and blank signature blocks for Smart Call and the "Customer." Among its terms and conditions, the MVNO agreement contained an arbitration provision providing for pre-arbitration mediation and, if necessary, binding arbitration at the American Arbitration Association (Wireless Industry Rules).

On December 5, 2008, Galvan forwarded to Stupansky and Ben Shoshan a redlined version of the MVNO agreement as an attachment to an email in which he stated that there were "almost no changes" and asked Stupansky and Ben Shosan to review the changes and "let me know your comments." Galvan further stated that

2

"we will be ready to sign immediately after your OK and will send the deposits and setup fees by Tuesday[.]"

On December 8, Stupansky responded to Galvan as follows:

> Attached is the final with all changes agreed to. Let's get it signed today so we can move on the SIM order Tuesday after we receive the 50% down for the SIM order and set up fees. . . .
>
> Here is the breakdown:
>
> Setup Fee: $50,000
>
> 50% of SIM order: $18,750
>
> Total: $68,750

Stupansky also included Smart Call's banking information in anticipation of Genio's wire transfer of the money.[1] That same day, Galvan responded:

> Thank you Richard, all looks good, the contract is protected and therefore can not make the additions of our company info, which now is as follows
>
> Genio Mobile Inc
> A Nevada corporation
> With Adress [sic] 3506 Highway 6 South Sute [sic] 280, Sugar Land, TX 77479
>
> Will be sign [sic] by Ricardo Flores, CEO
>
> Please send it to me and we will have it signed and scanned back to you today, original will follow via Fedex[.]

Later that afternoon, Stupansky forwarded to Galvan the updated contract by email. Attached to the email is a version of the MVNO agreement with the blank fields replaced by the parties' full names, states of incorporation, and principal

---

[1] The terms and conditions discussed were consistent with those contained in appendices to the MVNO agreement that were expressly incorporated into the circulated versions but were not attached to the circulated versions of the agreement in the record. Smart Call also submitted as evidence a version of the MVNO agreement with the appendices attached that was apparently taken from its files; this version was unsigned by either party and did not expressly refer to Genio as the customer.

places of business. The signature blocks also included the printed names of Ricardo Flores and Ben Shoshan as each party's CEO.

An invoice from Smart Call to Genio of the same date reflects that, consistent with the parties' negotiations, Smart Call invoiced Genio for 5,000 "Sim cards - Genio Mobile Inc." totaling $17,500.00, an MNVO "New account setup" fee of $50,000.00, and a "Sim Profile Setup Fee" of $20,000.00. Of the total $87,500.00 billed, the invoice reflected that Genio paid $68,750.00. According to Genio's petition, it paid this invoice "on or about" December 10, 2008.

Apparently, however, negotiations on a final agreement continued. An email exchange between Stupansky and Galvan on December 11 reflects that Flores forwarded to Galvan additional comments made by Genio's attorneys concerning the MVNO agreement. The comments refer to a redlined version of the "GSM MVNO Service Agreement" as well as appendices A and B to the agreement, but no redlined versions are attached to the emails in the record. Galvan in turn forwarded the email trail of comments to Stupansky. In the exchange between Galvan and Stupansky, Galvan wrote as follows:

> Richard: As you can see at the e-mail trail below I had a little difficulty getting all the attorney's to be on the same page, I decided to send you the whole requests, though most of them are not valid, I made my commitment to the new group that I will present to you anyway
>
> I am still ON for our conference today, but since I was delayed on sending you this document, I would understand if you want to postpone a little, while you have time to review the mails below, do not worry about their requests, again most of them will not apply or change what we have already negotiated . . . ."

In response, Stupansky wrote to Galvan, "Attached I have accepted most changes. Thanks Humberto[.]" Attached to this email is a version of the MVNO agreement that appears to incorporate at least some of the comments of Genio's attorneys, but

4

the fields for customer information and the information for the signature blocks were blank. All of the circulated versions, however, included the arbitration provision without comment or revision.

On February 4, 2009, Smart Call billed Genio $17,500 for 5,000 SIM cards and indicated "50% down payment required" on the invoice. The invoice reflected that Genio had made a payment of $8,700.00. On March 19, 2009, Smart Call invoiced Genio $7,000.00 for a "One Time Fee for Call Control Sim Application." This invoice reflected no payments by Genio and showed a balance due of $7,000.00. Genio alleges that, at a business meeting in Houston in June, Smart Call admitted that it was not able to provide the services and goods it had represented it could provide, and instead referred Genio to another service provider. According to Genio, Smart Call agreed to give Genio 2,000 SIM cards with a value of $7,000.00 as a gesture of "goodwill" and to help Genio transition to the new service provider.

In 2010, Genio sued Smart Call in Harris County for breach of contract and, in the alternative, quantum meruit and promissory estoppel. Genio attached to its petition the three invoices from Smart Call and a demand letter Genio's attorney sent to Ben Shoshan. In support of its breach-of-contract claim, Genio alleged that Smart Call and Genio had "entered into valid, enforceable contracts reflected in each invoice" and that, in each of the three invoices, Smart call offered to sell Genio "certain specific telecommunications services and goods" that Genio accepted by making payments totaling $84,450.00. Genio further alleged that, other than giving the 2,000 SIM cards valued at $7,000, Smart Call had failed to provide any of the remaining services and goods Genio had paid. As a result, Genio contended that it suffered actual damages of at least $77,450.00. Smart Call responded by filing a special appearance, which the trial court denied and this Court affirmed. *See* 349 S.W.3d at 766.

Back in the trial court, and shortly before trial was to commence, Smart Call moved to compel arbitration. Smart Call acknowledged that it could not produce a signed copy of the MVNO agreement, but argued that Genio's email correspondence and its conduct showed its acceptance of the MVNO agreement's terms. Genio responded that no valid and enforceable arbitration agreement existed between them and that the email correspondence on which Smart Call relied reflected "mere negotiation discussions" that did not refer to an agreement to arbitrate. Genio attached no affidavits or other evidence to its response. The trial court denied Smart Call's motion to compel arbitration after a non-evidentiary hearing.[2] Smart Call immediately filed a notice of interlocutory appeal from the trial court's order.

Four days later, trial commenced. Genio's counsel appeared, but Smart Call's counsel did not. Genio's counsel moved for a default judgment, explaining that in the course of preparing for trial, she discovered that Smart Call had never filed an answer. The trial court granted a final default judgment that same day, awarding Genio liquidated damages of $77,450.00, attorney's fees of $38,750.00, pre- and post-judgment interest, and court costs. Smart Call filed no motion for new trial. Smart Call did, however, file a second notice of appeal challenging the final default judgment, which this Court treated as an amended notice of appeal addressing both the trial court's interlocutory ruling on the motion to compel and the final judgment.

---

[2] Our record does not include a transcript of the hearing and nothing in the record indicates that the hearing was evidentiary. Therefore, we presume the hearing was non-evidentiary. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 783 (Tex. 2005).

6

In a single issue, Smart Call contends that the trial court erred in denying its motion to compel arbitration. Although conceding that it is unable to produce a signed MVNO agreement, Smart call asserts that no underlying fact dispute exists because Genio's correspondence and conduct demonstrate its intention to be bound by the MVNO agreement as a matter of law. Further, Smart Call argues that Genio presented no evidence of its own in response to Smart Call's motion to compel arbitration. Therefore, Smart Call contends, the trial court should have granted Smart Call's motion to compel arbitration. Moreover, because the trial court should have sent the parties to arbitration, it lacked authority to call the case to trial and enter the default judgment.

## A.    Standard of Review and Applicable Law

We review a ruling denying a motion to compel arbitration for an abuse of discretion, deferring to the trial court's factual determinations if they are supported by the evidence and reviewing its legal determinations de novo. *See Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008).

A party who seeks to compel arbitration of a claim must first establish the existence of a valid arbitration agreement. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex. 2001). The trial court's determination of the agreement's validity is subject to de novo review. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Although there is a strong presumption favoring arbitration, that presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exits. *Id.*

When deciding whether parties agreed to arbitrate, courts should apply ordinary state law principles regarding the formation of contracts. *First Options of*

*Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *J.M. Davidson*, 128 S.W.3d at 227–28. The reviewing court's primary concern in construing a written contract is to ascertain the intention of the parties as expressed in the agreement. *J.M. Davidson*, 128 S.W.3d at 229. If a valid agreement exists, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration. *Id.* at 227.

Under Texas law, the trial court conducts a summary proceeding to determine the applicability of an arbitration clause. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992). A motion to compel arbitration is similar to a motion for partial summary judgment and is subject to the same evidentiary standards. *In re Jebbia*, 26 S.W.3d 753, 756–57 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding). Thus, the party alleging an arbitration agreement must present summary proof that an agreement to arbitrate requires arbitration of the dispute. *Tipps*, 842 S.W.2d at 269; *Jebbia*, 26 S.W.3d at 757. The party resisting may then contest the opponent's proof or present evidence supporting the elements of a defense to enforcement. *Jebbia*, 26 S.W.3d at 757. If a material issue of fact is raised, an evidentiary hearing is required. *Tipps*, 842 S.W.2d at 269.

## B.    Smart Call's Motion to Compel Arbitration

Smart Call concedes that it cannot locate a signed MVNO agreement. The unsigned document that Smart Call contends is the MVNO agreement is attached to the affidavit of Michael Simms, Smart Call's general counsel, as Exhibit 2.

But Exhibit 2 is not only unsigned by either Smart Call or Genio, it also contains blank fields for the customer name and identifying information as well as blank signature blocks for the parties' signatures, names, titles, and dates of signing. Each of the three appendices attached to the document also include fields

8

for customer contact information, and all of these fields are blank. Genio is not identified as the customer anywhere on the document or its appendices. Genio is identified as the customer only through the document's apparent attachment to internal email correspondence between Smart Call personnel in May 2009 in which the subject "Genio Contract" is sent to the recipient.

Lacking any signatures on the document, Smart Call points to the following evidence submitted in support of its motion to compel arbitration as evidence of Genio's assent to the MVNO agreement:

- The correspondence between the parties "finally culminating" in the email exchange of December 8, 2009, in which Galvan represents that Ricardo Flores, Genio's CEO, will sign the MVNO after Smart Call revises the document to include Genio's company information;

- Genio's payment of contractually required deposits in amounts specified in Appendix A of the MVNO agreement, including a $50,000 set-up fee that was to be paid "within 10 days of executing this agreement via wire transfer";

- Genio's purchase of the SIM cards for use on Smart Call's network according to the provision of the MVNO agreement;[3] and

- The invoices attached to Genio's petition, which Smart Call alleges refer to the MVNO agreement by reference to the charge for "MVNO Setup" for a "New account setup."

Smart Call maintains that this evidence proves as a matter of law that Genio accepted the terms of the MVNO agreement, including the arbitration provision. Moreover, Smart Call contends that because Genio offered no controverting evidence, the trial court was required to refer the parties to arbitration. We agree that Smart Call has presented some evidence to support its position, but we

---

[3] Although Smart Call argues on appeal that the SIM cards are programmed with information and instructions unique to Smart Call's access network, this argument was not made in its motion to compel and Smart Call offers no record citation to support this representation; therefore, we do not consider it.

disagree that Smart Call's evidence is conclusive, because its own evidence raises a fact question concerning whether Genio intended to be bound by the MVNO agreement.

"Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007). In the absence of a signature, other evidence must be presented to prove the party's unconditional assent. *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, no pet.); *see Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418–19 (Tex. 1955) (citing *Corbin on Contracts* for the proposition that "[a]ll that is necessary to the creation of an informal contract, whether reduced to writing or not is an expression of assent in any form").

If one party signs a contract, the other party's acceptance may be demonstrated by its conduct. *See Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co.*, 849 S.W.2d 380, 392 (Tex. App.—Houston [14th Dist.] 1993, writ denied). In accord with Texas law, the Federal Arbitration Act does not require that an arbitration agreement be signed, but the agreement must be written and its terms agreed by the parties. *In re AdvancedPCS Health L.P.*, 172 S.W.3d 603, 606 (Tex. 2005) (per curiam). Whether the parties reached an agreement is a question of fact. *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Exhibit 2 contains signature blocks for both parties that are blank. Additionally, the document provides that it "may be modified only by a subsequent written document signed by the Parties." This provision and the blank signature blocks are some evidence that the parties did not intend to be bound until both parties signed the agreement. *See In re Bunzl*, 155 S.W.3d at 211 (citing *Rea*, 286

S.W.2d at 418–19); *Scaife v. Assoc. Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996). *But see In re Citgo Petroleum Corp.*, 248 S.W.3d 769, 774 (Tex. App.— Beaumont 2008, orig. proceeding) (declining to hold that contract provision requiring any modification or amendment be written and signed by parties created a fact issue because the issue was "whether the contract was assented to at its inception"). And, the fact that no customer information identifying Genio is supplied anywhere in the document suggests that the document was not intended as a final agreement, but only a draft document prepared during the course of continuing negotiations, much like the other versions circulated in the parties' emails.

Other evidence Smart Call presented to support its motion to compel arbitration also raises a fact issue concerning Genio's intent to be bound. Smart Call argues that Genio's president and CEO, Ricardo Flores, acknowledged that the SIM cards received under the invoices attached to its petition were "received pursuant to the terms of the MVNO agreement," citing the following deposition excerpt:

Q.    [Genio's counsel] Did you, Mr. Flores - -  did you receive SIMs - -

A.    [Flores] Uh-huh.

Q.     - - pursuant to the GSM MVNO service agreement?

A.    Uh-huh.

When placed in context, however, it is clear that Genio's counsel was asking whether Flores correctly answered a question asked earlier by Smart Call's counsel, and the above-cited exchange was Genio's counsel restating the question for Flores, as shown by the remainder of the exchange:

11

Q.     And I guess I'm assuming he's referring to Exhibit 3.[4] I'm not sure. He wasn't clear.

A.     Uh-huh.

Q.     What is the answer to that question?

A.     No. No.

Q.     And the reason for that is because this document, you can't remember, based on your testimony?

A.     That's right.

Q.     And also, based on your testimony, you've never signed this document?

A.     I don't remember - - I don't remember signing a document like this.

Thus, Smart Call's reliance on the excerpt of Flores's deposition testimony is misplaced, because Flores actually denied that he received the SIM cards pursuant to "the GSM MVNO agreement," he did not remember the document, and he could not recall signing it. This testimony is consistent with the allegations in Genio's petition that its breach-of-contract claim is based on the three invoices for products and services, not the MVNO agreement. Additionally, Flores repeatedly asserts throughout his deposition (which is attached in its entirety to the motion to compel) that Genio's lawsuit is based on its payment for the products and services reflected on the invoices, which Smart Call allegedly failed to provide, and not Smart Call's MVNO agreement.

Smart Call also points to the "unchallenged" affidavit of Michael Simms, in which he stated that "Smart Call made it clear we would not go forward until Genio agreed to the MVNO, and paid their deposit as required by the MVNO" and

---

[4] Exhibit 3 to Flores's deposition appears to be the same document as Exhibit 2 to Smart Call's motion to compel, but without the email correspondence.

that Genio "paid [its] deposit as required by the MVNO."[5]  Although Simms's testimony is some evidence of Smart Call's own intent to be bound by the MVNO agreement and its subjective understanding of what Genio intended, it does not conclusively demonstrate that Genio intended by its payment of the deposit to assent to the terms of the agreement or conclusively disprove that Genio's agreement with Smart Call is reflected in Smart Call's invoices, not the MVNO agreement.

In sum, Smart Call presented some evidence from which a fact finder could conclude that Genio agreed to the terms of the MVNO agreement reflected in Exhibit 2 through its correspondence and conduct. However, Smart Call's own evidence also raised a fact issue whether the parties reached an agreement. The trial court also had before it (1) Flores's testimony controverting Smart Call's claim that Genio agreed to the MNVO agreement, and (2) Exhibit 2, which Smart Call contends is the MVNO agreement, containing no information specific to Genio, numerous blank fields for customer information, and blank signature blocks. And, although Smart Call contends that the parties' email exchanges of December 8, 2009, demonstrate that Genio agreed to all of the MVNO agreement's terms, its own evidence also shows that negotiations continued even after that date.

Based on this conflicting evidence—including the lack of an agreement signed by either party—the trial court reasonably could have concluded that Smart Call failed to establish the existence of an agreement to arbitrate. Moreover, Smart Call did not request an evidentiary hearing and does not complain on appeal that the trial court failed to hold one. Therefore, we conclude that Smart Call has failed

---

[5] Notably, Simms does not represent that Exhibit 2 is a true and correct copy of the agreement between Smart Call and Genio; he avers only that it is a "true and correct copy of 20 May 2009 email correspondence between Smart Call personnel" even though Simms also stated that he personally participated in the negotiations with Genio.

to demonstrate that the trial court abused its discretion in refusing to compel arbitration. *See In re Bunzl*, 155 S.W.3d at 211–12.

## CONCLUSION

We hold that the trial court did not err in denying Smart Call's motion to compel arbitration and subsequently entering a default judgment against Smart Call. We affirm the trial court's judgment.


/s/    Ken Wise
       Justice

Panel consists of Chief Justice Frost and Justices Jamison and Wise.